# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2829 | **DATE** | 10/1/2002 |
| **CASE TITLE** | Tully vs. Gary Del Re | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached order, defendant's motion for summary judgment (52-1) is denied. The final pretrial order in the format required by LR Form 16.1.1 is to be filed by 10/31/02. Because of the prior delays in the proceedings in this case, and because this case will (unless it is settled) be the first one that this Court tries on the 1/6/03 trial call, the October 31 date will not be extended barring an unforeseen emergency. The final pretrial conference is set for 11/7/02 at 3:30 p.m. The 10/7/02 ruling date is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | 75 |
| ✓ | Docketing to mail notices. | *AR* docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRADLEY TULLY and )
ROLLOW ARLIN, )
 )
        Plaintiffs, )
 )
vs. ) Case No. 00 C 2829
 )
GARY DEL RE, Sheriff of Lake County, )
Illinois; TOM ROVETUSO; and )
STEVE SEMENEK, )
 )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

From 1993 through 1998, plaintiffs Bradley Tully and Rollow Arlin, who are brothers, owned and operated a bar in Russell, Illinois (which is in Lake County) called Da First Inning. They were active in local politics, and starting in November 1997 they actively supported Willie Smith, who had announced that he would oppose Lake County Sheriff Gary Del Re's re-election bid by running for Sheriff in the 1998 Republican primary. Tully and Arlin attended Smith's fundraisers, distributed his campaign literature, posted his campaign signs in the bar, and included a reference to Smith's candidacy in their 1200 square foot sign posted near Interstate 94. They contend that after their support for Smith became known, Lake County Sheriff's officers began harassing them and their patrons by monitoring the bar's parking lot, visibly taking down license numbers of patrons, and by coming into the bar in uniform and in groups, standing in the middle of the bar, and glaring at the patrons.

On May 12, 1998, a search warrant obtained by defendants Tom Rovetuso and Steve Semenek, both Lake County Sheriff's Police officers, was executed at Tully's home while relatives were gathering there following the death of Tully and Arlin's father. That same day, plaintiffs allege, Rovetuso and Semenek caused false criminal charges to be lodged against Tully and Arlin, obtained arrest warrants, and arrested Tully at the bar in front of a number of patrons. At the same time, the arresting officers seized the bar's business and liquor licenses. When the bar reopened several days later, business had slacked off, plaintiffs allege, due to the prior and continued police presence at the location. As a result, the bar had to be closed due to lack of sufficient business. Tully alleges that twice between May and October 1998, Lake County Sheriff's officers stopped his vehicle on the street for no legitimate reason, searching the entire vehicle on one of those occasions.

Arlin, though he was also named in a criminal complaint filed on May 12, 1998 and was the subject of an arrest warrant issued on that date, was not arrested at that time. Arlin claims he did not learn that criminal charges had been made against him until May 24, 2000, when he went to court on an unrelated civil matter and was arrested on the 1998 warrant.

In their second amended complaint, plaintiffs have made a claim against Sheriff Del Re under 42 U.S.C. §1983 alleging retaliation for their exercise of their First Amendment rights (Count 1); Arlin has asserted a §1983 claim against Del Re, Rovetuso and Semenek for violating their Fourth Amendment rights in connection with his arrest in May 2000 (Count 2); Tully has made a §1983 claim and a state law claim against Del Re arising from his false arrest and wrongful prosecution (Counts 3 and 5); and Arlin had made a §1983 claim and a state law claim against all of the defendants arising from his false arrest and wrongful prosecution (Counts 4 and

2

6). Defendants have moved for summary judgment. They contend, among other things, that there was probable cause to charge and arrest the plaintiffs. We therefore examine the facts surrounding the charge and the arrest.

Defendants claim that on March 30, 1998, Virginia Ryba, who was detained at the Lake County Jail awaiting trial on felony charges, made a written request to speak with someone from the Sheriff's Department regarding information she might have. Rovetuso says he was assigned to respond to the request and met with Ryba, whom he did not know and had not previously met. He claims that Ryba told him that on March 28, she had asked Tully if he had any "acid" (LSD), and Tully had replied that he had sold what he had and would not have any more until March 30. Ryba also told Rovetuso that Tully had a photo album with pictures of him having sex with underage females. Rovetuso says he enlisted Semenek to assist him, and the two of them re-interviewed Ryba, who repeated the same information. They say that Tully had a prior drug arrest (although the charges had been dropped), they had heard "rumors" about Tully having sex with underage females, and they were aware of a complaint against Tully about serving liquor to a minor. All of this, according to defendants, gave them a legitimate basis to pursue further investigation.

Ryba agreed to make several "controlled purchases" of narcotics from Tully. On the night of March 30, Ryba, in Rovetuso's presence, called Tully. The parties agree that Ryba told Rovetuso that on the phone, Tully had agreed to meet with her the next day to sell her some LSD. Rovetuso obtained approval from the Lake County State's Attorney and a Lake County Judge to attach a recording device to Ryba. On March 31, Ryba and her vehicle were searched by a female Sheriff's officer, and the body recorder was attached. Another officer in a surveillance

van set up outside the bar with a video camera. Ryba entered the bar and came out and gave Rovetuso twelve small pieces of paper that she said were LSD "hits," saying she had bought ten from Tully and two from another man she had not previously met. Defendants claim that a field test came up positive for LSD, though they concede that later laboratory testing was negative. No tape of the meeting was made because the recorder had been unplugged.

On April 3, Ryba told Rovetuso, Semenek, and other officers that she had made arrangements with Tully by phone on April 2 to purchase from him 1/16 of an ounce of cocaine. Ryba and her car were searched, she was fitted with the recorder, video surveillance was set up, and Ryba entered the bar. Semenek observed Arlin exit the bar with an unknown man, get into Ryba's car with the man, and re-enter the bar. Ryba then left the bar and later gave the officers a small packet of cellophane containing a white powder. A field test and later laboratory test were positive for cocaine.

On April 7, Ryba told Rovetuso and Semenck that she had spoken with Tully on April 6 and arranged to buy LSD from him at the bar. After following the same procedure as in the earlier meetings, Ryba entered the bar, came out after a brief period, and later gave the officers 16 pieces of paper, saying they were LSD "hits." Defendants claim that a field test was positive for LSD but concede that a later laboratory test was negative. A similar chain of events took place on April 13.

On May 12, Rovetuso met with a Lake County prosecutor and related the information about the supposed undercover drug buys, advising the prosecutor that the recording device had failed each time so that no record of the conversations with Tully or Arlin had been made. He also advised the prosecutor of the three negative lab tests for LSD and the positive lab test for

4

cocaine. The prosecutor prepared an information charging Arlin with possession and delivery of cocaine and Tully with unlawful delivery of a "look-alike" substance, and he prepared applications for search warrants for the bar and Tully's home. A Lake County judge issued the requested search warrants and a warrant for Arlin's arrest (it is unclear whether a warrant for Tully's arrest was issued). The search warrants were executed that same day, and Tully was arrested at the bar. No drugs or pornography was found. As previously noted, Arlin was not arrested at that time. The charges against Tully were "nolle prossed" in June 1998. As noted earlier, Arlin was arrested on May 24, 2000, but the charges against him were "nolle prossed" in June 2000.

If the factual scenario we have just recited were all we had, we would have no hesitation in holding that the officers had probable cause. But there are always two sides to a story, and plaintiffs' side differs dramatically from defendants'. Plaintiffs have submitted an affidavit from Ryba, who says that when she was arrested on March 6, 1998, she was a heroin addict and seven months pregnant. She began to undergo withdrawal while in the Lake County Jail and says that the jailers knew that she was pregnant and an addict undergoing withdrawal, and that both of these things were obvious to anyone who saw her at that time. About a week after her arrest, Ryba says, she was taken without prior notice or request to the Sheriff's office and was interviewed by Rovetuso and Semenek, who asked her about several people, including Tully. Ryba says that after she told the officers that she knew who Tully was, they told her that he was a "bad guy" and that they wanted to "get him." Ryba was desperate to get out of jail and says she agreed to try to set Tully up in order to obtain leniency for herself. There were several more meetings with the officers, who eventually told her that they had arranged for her to be released

5

from jail on "furlough." The judge presiding over Ryba's case initially balked after being told by a Probation officer that she was a pregnant heroin addict but later acceded to the prosecution's request to release her.

Ryba says that she began using heroin upon her release. A few days later, she met with Rovetuso, Semenek and others; again, she says, the fact that she was using drugs would have been obvious to them. On March 31, she met with the officers at a police firing range; they told her to go to Tully's bar and buy LSD from him and gave her money to use for the purchase. According to Ryba, she cut up a greeting card into small pieces and hid them in her shoes, which she says were not searched. After entering the bar, she unplugged the recording device that had been hooked up to her, put the buy money in her shoe, and removed the pieces of paper that she had put there, then exited the bar, returned to the firing range, and gave the pieces of paper to the officers. She did not see them perform a test, and they did not ask her how the recorder had become unplugged. She later used the money to buy heroin for herself.

The other meetings followed a similar course; the only significant gap in Ryba's affidavit concerns how she came up with the cocaine at the second meeting, though she swears that she did not speak with Tully when inside the bar that time and did not even see Arlin. By May 6, Ryba says, she knew her furlough was going to be revoked because she had tested positive for heroin. She became depressed, called Rovetuso and told him she could not longer work with him but did not want to go back to jail, and that she intended to kill herself. Rovetuso and others came and met with Ryba and took a suicide note that she had written; Rovetuso said that he wanted to "enter [it] into evidence." She was returned to jail. On May 10, she jumped off of a second-floor tier in what she says was an unsuccessful suicide attempt.

Tully and Arlin have both submitted affidavits stating that they never sold narcotics to Ryba. Tully's daughter, Michelle Tully, is a lawyer with an office in downtown Waukegan. She says that in 1997-98, she had three large signs supporting Willie Smith on the lawn in front of her office, which was located near the Lake County Sheriff's Office, Jail, and Courthouse, and that she was an open and active supporter of Smith. A few days after her father's arrest, Tully says she spoke with a female Lake County sheriff's deputy whom she knew from a health club where they both worked out but who did not know she was plaintiff Tully's daughter. She says that the deputy told her that she did not feel that she would "fit in" at the Sheriff's Office, which she had recently joined, and recounted that officers were aware that the informant used as the basis to arrest Tully (namely Ryba) had disconnected her surveillance microphone and that she had reported this to her superiors but was told to keep quiet and "go along with the game plan." Some weeks after Tully's arrest, Michelle inquired about picking up personal items that had been seized pursuant to the search warrants and was directed to the Sheriff's Department. When she went there to pick up the items, she was told to come back at a specific time later in the day, and when she did so, Sheriff Del Re himself came out and handed her a box with the items.

The evidence also reflects that the tape recordings made by Ryba have vanished, as have the video recordings made of her comings and goings at Da First Inning. Her suicide note, allegedly seized by Rovetuso, cannot be found, and the records that ordinarily would exist documenting her comings and goings from her jail cell and her suicide attempt at the jail are also missing. Ryba's handwritten accounts of her dealings at the bar (which she says were false in any event) are likewise missing, as are the field test kits which purportedly showed positive results for LSD.

7

Tully and Arlin contend that Rovetuso and Semenek, acting at Del Re's direction or at least with his knowledge and tacit approval, importuned Ryba to set them up, making it clear to her (though perhaps without directly saying so) that they wanted evidence against Tully no matter what she had to do to manufacture it. They contend that the officers knew, or recklessly disregarded, that the information from Ryba was false and thus acted improperly in obtaining the search and arrest warrants.

In their motion for summary judgment, defendants made five separate arguments: plaintiffs lack evidence from which a jury could conclude that Del Re had any involvement in the alleged constitutional deprivations; there was probable cause supporting both arrests; defendants are entitled to qualified immunity; and Arlin's claims against Rovetuso and Semenek are time-barred; and Arlin can make no claim against Semenek because he did not swear out the complaint used to obtain the arrest warrant for Arlin. Three of these arguments can be dealt with quickly, as they were essentially abandoned by defendants after plaintiffs responded to the motion for summary judgment.

1.  **Probable cause**

In response to defendants' probable cause arguments, plaintiffs contended that their First Amendment retaliation claims do not turn on, and are not defeated by, the absence of probable cause. *See* Pltf. Mem. in Resp. to Dfdt. Mot. for Summ. Judgt. at 14-15. Defendants have not challenged the legal premise underlying this argument (indeed they have not addressed it at all) and thus must be deemed to have conceded it, at least for present purposes. In any event, taking the evidence in the light most favorable to the plaintiffs as we must in the present context, there are genuine issues of fact that would preclude entry of summary judgment even if probable cause

were a defense to plaintiffs' claims. Among other things, Ryba's testimony, if believed, would be enough to permit a jury to find that no reasonable officer could have believed that probable cause existed. According to Ryba, Rovetuso and Semenek implicitly importuned her to manufacture a basis for charges against Tully – and, by extension, Arlin – and either realized or recklessly disregarded that she had done exactly that. A jury that believed Ryba's account and the other evidence offered by plaintiffs – including the apparent evidence of a cover-up carried out by "losing" the evidence – reasonably could find that no reasonable officer could have believed that Ryba had actually bought anything from either plaintiff.

### 2. Statute of limitations

Defendants argued in their motion that Arlin's claims against Rovetuso and Semenck were time-barred because the arrest warrant against Arlin was issued on May 12, 1998, but Rovetuso and Semenek were not added as defendants until March 27, 2001, more than two years after the issuance of the warrant. Arlin responded that his claim did not accrue until the charges against him were dismissed in June 2000, or at least not until he was arrested in May 2000; thus his claim against the officers, filed less than one year later, was timely. Defendants did not reply and thus are deemed to have conceded the point. Even if they had not done so, the Court agrees with Arlin that his claim did not accrue until he was actually arrested, as he had suffered no actionable deprivation prior to that time. Defendants cite no authority supporting the proposition that a false arrest claim accrues not at the time of the arrest, but rather at the time the warrant issues. The cases the Court has found indicate that the claim accrued no earlier than the time of the arrest. *See, e.g., Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998) (false arrest claim accrues at time of arrest); *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892,

900 (7th Cir. 2001) (false arrest claim that is akin to malicious prosecution claim accrues at time prosecution is terminated in arrestee's favor).

### 3. Arlin's claim against Semenek

Semenek argued in the summary judgment motion that Arlin could not make out a Fourth Amendment claim against him arising from his arrest because Semenek was not the officer who convinced the State's Attorney to file charges. In response, Arlin argued that it is conceivable that Semenek swore out the complaint that was used to obtain the arrest warrant (the complaint, like virtually every other piece of physical evidence, cannot be found), and that in any event, Semenek's role in the alleged fabrication of charges is enough to allow a jury to impose liability. Semenek did not reply and thus, once again, is deemed to have conceded the point for present purposes. Even if he had not done so, the Court would deny summary judgment on this basis. Semenek's knowing participation in a scheme to frame Tully and Arlin would, if proved, permit a jury to find that he was personally responsible for plaintiffs' arrest and the bringing of charges even if he was not the particular schemer who approached the prosecutor or signed the criminal complaint. *See generally Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (official may be "personally responsible" and therefore liable for constitutional deprivation if he knew about the conduct and facilitated, approved, condoned, or turned a blind eye to it, or if the deprivation occurred with his knowledge and consent).

### 4. Qualified immunity

Both Rovetuso and Semenek claim that they are entitled to qualified immunity for their actions under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The qualified immunity inquiry is closely related to the inquiry into whether probable cause existed. Probable cause to arrest exists

10

if "at the moment the arrest was made . . . the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the arrestee had violated the law. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (internal quotation marks omitted). Even if probable cause did not exist, the arresting officer is immune from suit if a reasonable officer could have believed the arrest was lawful in light of clearly established law and the information the officer possessed. *Id.* at 227. In other words, a law enforcement official who "reasonably but mistakenly conclude[s] that probable cause is present" is entitled to immunity. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)) (internal quotation marks omitted). As with the issue of probable cause, the evidence supporting plaintiffs' claim that the defendants caused the fabrication of a phony basis for charges against Tully and Arlin, and that they could not reasonably have relied on what Ryba told them about what happened inside the bar, is more than sufficient to create a genuine factual dispute precluding entry of summary judgment on the issue of qualified immunity.

### 5. Del Re

Del Re seeks summary judgment, claiming there is no evidence of his involvement in the deprivations that form the basis of plaintiffs' claims. Tully and Arlin concede that they have no direct evidence that Del Re was behind the actions of Rovetuso and Semenek, but it goes without saying that a plaintiff can prove try to prove his case by circumstantial evidence even if he lacks direct evidence. Conspiracies are by their nature carried out in secret, and thus direct proof of agreement is rare, *see United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995); the law does not inexorably require a confession by the schemer, an admission by a co-schemer, or other direct

11

evidence of the schemer's involvement. In supporting their claim of liability against Del Re, plaintiffs point to the following evidence:

- They had always had good relations with the Sheriff's department; the alleged harassment did not begin until after they publicly supported Del Re's opponent Willie Smith.

- Their support of Smith was open and notorious; their billboard near I-94 expressing their support of Smith was huge and likely was seen by Del Re during his ordinary travels in the county or likely was otherwise known to him.

- When Tully's daughter made arrangements to pick up Tully's personal property, Del Re, the Sheriff, personally brought it to her. This event is fairly described as curious. Waukegan, the county seat, is not a one-horse town; the Sheriff's department is not small; and presumably the department's chief is not ordinarily responsible for returning property seized in cases that he supposedly had nothing to do with. A reasonable observer could infer that Del Re was trying to impress a point upon Tully via his daughter.

- Virtually every piece of evidence, some of which would be expected to be in the custody of officers other than Rovetuso and Semenek, has disappeared, thus suggesting the participation of others in the scheme or at least a cover-up.

- The alleged harassment scheme went far beyond Rovetuso and Semenek. For example, other Sheriff's officers were involved in observing patrons at Da First Inning and in allegedly stopping Tully's vehicle without basis. The only common link is Del Re, who had supervisory authority over all of them.

In short, Del Re arguably had a motive to cause others to retaliate against plaintiffs, and he had the opportunity to do so by virtue of his supervisory authority over all of the alleged direct participants. Though we disagree with plaintiffs' claim that Del Re's involvement is the *only* reasonable inference – as it is likewise conceivable that other officers could have harassed supporters of Del Re's opponent in a misguided attempt to ingratiate themselves with the boss – it is certainly *a* reasonable inference.

## Conclusion

For the reasons stated above, defendants' motion for summary judgment [docket item 52-1] is denied. The final pretrial order in the format required by LR Form 16.1.1 is to be filed by October 31, 2002. Because of the prior delays in the proceedings in this case, and because this case will (unless it is settled) be the first one that this Court tries on the January 6, 2003 trial call, the October 31 date will not be extended barring an unforeseen emergency. The final pretrial conference is set for November 7, 2002 at 3:30 p.m. The October 7, 2002 ruling date is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 1, 2002